**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

KENNETH P.,

        Plaintiff,

    v.

ANDREW MARSHALL SAUL,
Commissioner of Social Security,

        Defendant.

Case No. 18-cv-3346

Magistrate Judge Sunil R. Harjani

## MEMORANDUM OPINION AND ORDER

Plaintiff Kenneth P.[1] seeks judicial review of the final decision of the Commissioner of

Social Security denying his application for Disability Insurance Benefits and Supplemental

Security Income Benefits. Specifically, Kenneth seeks an award of benefits, or in the alternative,

a remand to the Commissioner for further proceedings. The Commissioner filed a motion for

summary judgment, asking the Court to affirm the ALJ's denial of benefits. For the reasons set

forth below, the ALJ's decision is reversed and this case is remanded for further proceedings

consistent with this Memorandum Opinion and Order.

## I. BACKGROUND

Before filing for disability benefits in 2014, Kenneth worked as a mailer and warehouse

worker. (R. 302). In 2011, Kenneth was diagnosed with Multiple Sclerosis (MS), after he began

experiencing problems with vision, speech, and balance. *Id.* at 396, 418, 431. Following his

diagnosis, Kenneth began taking weekly injections of a medication called Avonex but continued

---

[1] Pursuant to Northern District of Illinois Internal Operating Procedure 22, the Court refers to
Plaintiff by his first name and the first initial of his last name or alternatively, by first name.

to report issues with balance and vision; he additionally conveyed difficulties with memory, concentration, mood, pain, and weight loss. *Id.* at 412, 431. At his hearing before the ALJ, Kenneth testified that in 2013 he was fired from his most recent job because his supervisor had to keep reminding him about simple tasks. *Id.* at 48-49, 68-69. According to Kenneth, his memory "wasn't working like it should." *Id.* at 69. After filing for disability benefits, Kenneth was examined and evaluated by several medical professionals.

Kenneth filed applications for disability benefits and supplemental security income benefits in April of 2014, alleging disability beginning January 26, 2013. (R. 18). Kenneth's claims were initially denied on September 2, 2014, and upon reconsideration on May 22, 2015. *Id.* Upon Kenneth's written request for a hearing, he appeared and testified at a hearing held on February 1, 2017 before ALJ James D. Wascher. *Id.* The ALJ also heard testimony from vocational expert Linda Gels. *Id.* at 36.

On May 26, 2017, the ALJ issued a decision denying Kenneth's applications for disability benefits and supplemental security income benefits. (R. 29). The opinion followed the required five-step evaluation process. 20 C.F.R. § 404.1520. At step one, the ALJ found that Kenneth had not engaged in substantial gainful activity since January 26, 2013, the alleged onset date. *Id.* at 20. At step two, the ALJ found that Kenneth had the severe impairments of relapsing and remitting multiple sclerosis, degenerative disc disease of cervical spine, and depressive disorder. *Id.* At step three, the ALJ determined that Charles did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926). *Id.* at 21.

The ALJ then concluded that Kenneth retained the residual functional capacity ("RFC") to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) and 416.967(a), except that he:

> can never climb ladders, ropes, or scaffolds, occasionally climb ramps and stairs, occasionally stoop, kneel, crouch, and crawl, frequently reach overhead bilaterally, can have only occasional exposure to extreme cold and extreme heat, must avoid all hazards such as machinery with moving mechanical parts and unprotected heights, only occasional bilateral wrist flexion and extension, and is able to perform simple tasks with no interaction with the public.

(R. 22). Based on this RFC, the ALJ determined at step four that Kenneth could not perform his past relevant work as a warehouse worker and machine feeder. *Id.* at 27. At step five, the ALJ found that there were jobs that exist in significant numbers in the national economy that Kenneth could perform. *Id.* at 28-29. Specifically, the ALJ found Kenneth could work as a document repairer, table worker, and touch up screener. *Id.* at 28. Because of this determination, the ALJ found that Kenneth was not disabled. *Id.* at 28-29. The Appeals Council denied Kenneth's request for review on April 11, 2018, leaving the ALJ's decision as the final decision of the Commissioner. *Id.* at 1; *McHenry v. Berryhill*, 911 F.3d 866, 871 (7th Cir. 2018).

## II. DISCUSSION

Under the Social Security Act, disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To determine whether a claimant is disabled, the ALJ conducts a five-step inquiry: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals any of the listings found in the regulations, *see* 20 C.F.R. § 404, Subpt. P, App. 1 (2004); (4) whether the claimant is unable to perform his former occupation; and (5)

whether the claimant is unable to perform any other available work in light of his age, education, and work experience. 20 C.F.R. § 404.1520(a)(4); *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). These steps are to be performed sequentially. 20 C.F.R. § 404.1520(a)(4). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Clifford*, 227 F.3d at 868 (quoting *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985)).

Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon a legal error. *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "Although this standard is generous, it is not entirely uncritical." *Steele*, 290 F.3d at 940. Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Id.*

The ALJ found Kenneth not disabled at step five of the sequential analysis because he retains the RFC to perform other work that exists in significant numbers in the national economy. Kenneth asserts that the ALJ committed several reversible errors. First, Kenneth argues that the ALJ erred in failing to assess his subjective allegations according to SSR 16-3p. Second, Kenneth argues that the ALJ erred in failing to afford great weight to the opinion of Kenneth's treating neurologist, Dr. Afif Hentati. Third, Kenneth asserts that the ALJ's RFC assessment and hypothetical questions to the vocational expert did not reflect Kenneth's difficulty with concentration, persistence, or pace.

The Court finds that the ALJ erred in the discounting of Dr. Hentati's opinion.  The Court also finds that the ALJ's RFC assessment and the relied-upon hypothetical question did not adequately encompass Kenneth's issues with concentration, persistence, or pace.[2]  Accordingly, for the reasons discussed below, the ALJ's decision must be reversed.

### A.        Treating Physician Dr. Hentati

Kenneth argues that the ALJ erred when he afforded only "some weight" to Kenneth's treating neurologist, Dr. Hentati.  Kenneth further asserts that the reasons the ALJ provided for discounting Dr. Hentati's opinion were "based on legal or factual errors." (Doc. 18 at 9).  The Commissioner responds that the ALJ reasonably adopted the majority of Dr. Hentati's opinion, while discounting "those portions of the opinion that were unsupported by evidence." (Doc. 29 at 1).

The opinion of a treating source is entitled to controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(c)(2); *Kaminski v. Berryhill*, 894 F.3d 870, 874, 874 n.1 (7th Cir. 2018) (for claims filed before March 27, 2017, an ALJ "should give controlling weight to the treating physician's opinion as long as it is supported by medical findings and consistent with substantial evidence in the record.").  An ALJ must "offer good reasons for discounting a treating physician's opinion." *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (citations omitted); *see also Walker v. Berryhill*, 900 F.3d 479, 485 (7th Cir. 2018).  Those reasons must be "supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Gudgel v.*

---

[2] Because these errors require remand, the Court does not address Kenneth's remaining argument that the ALJ's subjective allegation assessment was wrong.

*Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). "If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009); *see* 20 C.F.R. § 404.1527(c).

In Dr. Hentati's medical source statement, he drew opinions about Kenneth's physical and mental limitations. With respect to Kenneth's physical limitations, Dr. Hentati concluded that Kenneth would be "unable to perform jobs requiring physical strength," while noting the following limitations:

**II. Limitations Resulting From Patient's Impairments**

| Activity: | More than 50% reduced | 20%-50% reduced capacity | Up to 20% reduced capacity | No limitation |
|---|---|---|---|---|
| Sit (per 8-hour day) | | | | ✓ |
| Stand/walk (per 8-hour day) | | ✓ | | |
| Climb (ladder/stairs) | | ✓ | | |
| Twist | | ✓ | | |
| Bend/stoop | | ✓ | | |
| Squat/kneel | | ✓ | | |
| Crawl | | | | ✓ |
| Reach (Left, Right, Both) | | | | ✓ |
| Work above shoulders (L,R,B) | | | ✓ | |
| Keyboard (L,R,B) | | | | ✓ |
| Wrist—flexion/extension (L,R,B) | | | ✓ | |
| Fine Manipulation (L,R,B) | | | | ✓ |
| Foot controls (L,R,B) | | | | |

| Lifting/Carrying | <10 lbs. | 10 lbs. | 20 lbs. | 50+ lbs |
|---|---|---|---|---|
| Frequently | | | ✓ | |
| Occasionally | | | ✓ | |

(R. 537-538). Directly after these notations, Dr. Hentati opined that fatigue and balance issues would cause an inability to sustain a regular 40-hour work schedule. *Id.* at 538. In supporting this

opinion, Dr. Hentati reasoned that Kenneth "has limitation in physical ability with difficulty with balance making him unable to perform a job that requires physical strength: may fall." *Id.* at 539.

As for Kenneth's mental limitations, Dr. Hentati stated that Kenneth could not adequately perform a desk job requiring memory and attention. Dr. Hentati also wrote that Kenneth's symptoms affect his ability to concentrate. Dr. Hentati reasoned that Kenneth "has fatigue and difficulty with concentration common in multiple sclerosis that makes him unable to perform a desk job." (R. 539).

In his evaluation of Dr. Hentati's opinions, the ALJ stated that his RFC finding was "largely based on the opinions of the claimant's treating provider . . . as seen in Exhibit 13F [Dr. Hentati's medical source statement], except for some portions that are noted on page four of the Exhibit. . . ." (R. 25). The ALJ found that Dr. Hentati's opinions were "generally consistent" with the evaluations and opinions of the State agency medical consultants. *Id.* at 26. The ALJ further stated that he reduced the RFC exertional level to "accommodate fatigue and balance problems that were noted by . . . Dr. Hentati . . . ." *Id.* According to the ALJ, Dr. Hentati's opinion that Kenneth would be unable to perform jobs requiring physical strength was "somewhat vague, and in some degree . . . contradicted by the opinion the claimant can lift twenty pounds occasionally, and frequently stand or walk up to eighty percent of the day." *Id.* With respect to Dr. Hentati's opinion that Kenneth could not sustain a 40-hour a week work schedule due to fatigue issues, the ALJ stated only "there is insufficient evidence that these symptoms are at a point they cannot be accommodated by sedentary limitations with further postural and environmental limitations." *Id.* Finally, after summarizing Dr. Hentati's notations on Kenneth's physical limitations (inserted above), the ALJ concluded, "These opinions are afforded some weight as they reflect assessments of the claimant's treating neurologist who has seen the claimant since 2011." *Id.*

As an initial matter, it is difficult for the Court to discern how much weight the ALJ assigned to Dr. Hentati's opinions. The ALJ stated that he afforded "some weight" to Dr. Hentati's opinions, but the phrase "some weight" is not particularly useful in conveying the weight given to a treating physician. In *Larson v. Astrue*, the ALJ stated that he gave "some weight" to the treating physician's opinion, but that the doctor's assessment was not sufficiently corroborated by the record. 615 F.3d 744, 748 (7th Cir. 2010). The Seventh Circuit reversed the ALJ's decision to deny benefits, reasoning: "Even if the ALJ had articulated good reasons for rejecting Dr. Rhoades's opinion, it still would have been necessary to determine what weight his opinion was due under the applicable regulations . . . Apart from the ALJ's *unhelpful statement that Dr. Rhoades's opinion was entitled to 'some weight,'* the ALJ said nothing regarding [the] required checklist of factors." *Id.* at 751 (emphasis added). Here, the ALJ's sparse statement that he afforded "some weight" to Dr. Hentati, as Kenneth's treating neurologist since 2011, is similarly unhelpful because the Court does not know how much weight was actually given.

The ALJ's comment that the RFC was "largely based" on Dr. Hentati's medical source statement "except for some portions that are noted on page four," is likewise unhelpful, as the document is only three pages long, and it is unclear which portions of the medical source statement the ALJ was referring to. Nevertheless, the Court is able to discern that the ALJ did not give controlling weight to Dr. Hentati's opinions, at least with respect to Kenneth's physical limitations, as the ALJ found that there were jobs in significant numbers in the national economy that Kenneth could perform. Such a finding directly contradicts Dr. Hentati's opinion that Kenneth's fatigue and balance issues would prevent him from holding down a 40-hour per week job.

Because the ALJ did not give controlling weight to Dr. Hentati's opinions, he had to "consider the length, nature, and extent of the treatment relationship, frequency of examination,

the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Moss*, 555 F.3d at 561; *see* 20 C.F.R. § 404.1527(c). An ALJ's failure to explicitly apply the checklist can be grounds for remand. *See, e.g.*, *Yurt v. Colvin*, 758 F.3d 850, 860 (7th Cir. 2014) ("in addition to summarizing [the treating physician's] visits and describing their treatment notes, the ALJ should explicitly consider the details of the treatment relationship and provide reasons for the weight given to their opinions"); *Campbell*, 627 F.3d at 308 ("the decision does not explicitly address the checklist of factors as applied to the medical opinion evidence."); *Larson*, 615 F.3d at 751 (remanding where the ALJ's decision "said nothing regarding this required checklist of factors."); *Wallace v. Colvin*, 193 F. Supp. 3d 939, 947 (N.D. Ill. 2016) ("the ALJ did not explicitly apply the checklist. In this Court's view, that failure alone is a ground for a remand.").

Here, the ALJ did not appropriately address each of the checklist's factors. The ALJ's application of the checklist seems limited to one sentence: "These opinions are afforded some weight as they reflect assessments of the claimant's treating neurologist who has seen the claimant since 2011." (R. 26). For instance, the ALJ did not discuss the nature or extent of Dr. Hentati's treatment relationship with Kenneth. Under 20 CFR § 404.1527(c)(2)(ii), the ALJ "will look at" the treatment that the treating source provided and the type of examinations and testing that the treating source has performed or ordered from specialists. The regulation explains by example that an ophthalmologist who merely *notices* neck pain during eye examinations will be given less weight than that of another physician who actually treated the patient's neck pain. *Id.* Here, the ALJ did not discuss the types of techniques used by Dr. Hentati. *See Jennifer C. v. Saul*, No. 18 C 1243, 2019 WL 4345344, at *5 (N.D. Ill. Sept. 12, 2019) (holding ALJ discussed nature and extent of the treatment relationship by describing the timespan of the relationship, as well as the treating

physician's use of "myofascial release techniques"). The ALJ did not comment on the cranial nerve, motor, cerebellar, sensory, and gait exams performed by Dr. Hentati either. (*See, e.g.,* R. 483-84). In addition, the ALJ failed to describe the prescriptions and MRI scans ordered by Dr. Hentati in his weight analysis. *Id.* at 484, 520. As a result, the Court cannot determine whether the ALJ accounted for the nature or extent of Dr. Hentati's treatment relationship with Kenneth when weighing his opinions.

Nor did the ALJ expressly weigh the frequency of Dr. Hentati's examinations under 20 CFR § 404.1527(c)(2)(i). The regulation recognizes this factor's importance as to the weight of a treating source's medical opinion. Under 20 CFR § 404.1527(c)(2)(i), "[g]enerally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion." And that whenever "the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the medical source's medical opinion more weight than we would give it if it were from a nontreating source." *Id.* Here, it is not clear whether the ALJ accounted for the frequency of Dr. Hentati's treatment relationship because the ALJ did not state that he had recognized that the treatment relationship spanned at least seven visits. (*See* R. 412, 418, 422, 463, 482, 518).

The ALJ did assess, albeit briefly, the consistency and supportability of Dr. Hentati's opinions. *See* 20 CFR § 404.1527(c)(3)-(4). The ALJ stated that Dr. Hentati's opinion that Kenneth was unable to perform jobs requiring physical strength was "somewhat vague, and in some degree . . . contradicted by the opinion the claimant can lift twenty pounds occasionally, and frequently stand or walk up to eighty percent of the day." (R. 26). With respect to Dr. Hentati's opinion that Kenneth could not sustain a 40-hour a week work schedule, the ALJ concluded,

without elaboration, that there was "insufficient evidence that these [fatigue] symptoms are at a point they cannot be accommodated by sedentary limitations with further postural and environmental limitations." *Id.*

Even if the ALJ's barebones assertions about consistency and supportability could satisfy the checklist requirement, they do not constitute "good reasons" for discounting Dr. Hentati's opinions. *Campbell*, 627 F.3d at 306. The ALJ's first expressed reason for discounting Dr. Hentati's opinion about Kenneth's inability to perform a job requiring physical strength was that the opinion was "vague" and somewhat contradicted by Dr. Hentati's opinion that Kenneth "can lift twenty pounds occasionally, and frequently stand or walk up to eighty percent of the day." (R. 26). But Dr. Hentati never opined that Kenneth can frequently stand or walk up to eighty percent of the day. Rather, Dr. Hentati indicated that Kenneth had a 20-50% reduced capacity to stand or walk per 8-hour day as a result of his impairments. *Id.* at 538. Thus, the ALJ's first reason for discounting Dr. Hentati's opinion is supported by an inaccurate summary of his opinion, not "substantial evidence in the record." *Gudgel*, 345 F.3d at 470.

With respect to Dr Hentati's opinion that Kenneth's fatigue and balance issues prevented him from sustaining full-time employment, the ALJ's conclusion that there was "insufficient evidence that these [fatigue] symptoms are at a point they cannot be accommodated by sedentary limitations with further postural and environmental limitations" also lacks substantial support in the record. Again, the ALJ inaccurately summarized Dr. Hentati's opinion by characterizing his opinion as a statement that Kenneth cannot sustain a 40-hour work schedule due only to fatigue issues. In Section II of his medical source statement, labeled "Limitations Resulting From Patient's Impairments," Dr. Hentati noted that Kenneth had a 20-50% reduced capacity in: standing or walking (per 8-hour day); climbing (ladder/stairs); twisting; bending; and squatting or

kneeling. (R. 538). Dr. Hentati also noted up to a 20% reduced capacity in Kenneth's ability to work above his shoulders and in wrist-flexion/extension. *Id.* Dr. Hentati further stated that Kenneth's fatigue and balance issues would cause an inability to sustain a 40-hour work schedule, and that Kenneth's symptoms affected his ability to concentrate. *Id.* In Section III of his statement, titled "Reasons Supporting Your Opinion," Dr. Hentati elaborated that Kenneth "has limitation in physical ability with difficulty with balance making him unable to perform a job that requires physical strength: may fall." *Id.* at 539. Dr. Hentati additionally stated that Kenneth "has fatigue and difficulty with concentration common in multiple sclerosis . . . ." *Id.* Dr. Hentati's opinion therefore was not simply a statement that fatigue would keep Kenneth from sustaining a fulltime job. Rather, Dr. Hentati's opinion was that several impairments, including a reduced capacity in standing or walking, balance, fatigue, and concentration issues, prevented Kenneth from being able to sustain a 40-hour per week job. The ALJ's mischaracterization of that opinion does not constitute substantial evidence in the record.

Moreover, there is evidence in the record that could indicate serious issues with fatigue and balance. Since being diagnosed with MS in 2011 (and even before), Kenneth consistently reported to physicians that he struggled with fatigue and weakness. (*See, e.g.*, R. 396, 418, 450, 518.) At his hearing before the ALJ, Kenneth testified to feeling "lightness" and "weakness" when on his feet, causing him to need to regroup after about 30 to 60 minutes of standing. *Id.* at 50. In a November 2016 appointment with Dr. Hentati, Kenneth complained of back pain, mood swings, poor vision, dizziness, weakness, memory problems, and balance problems. *Id.* at 518. Dr. Hentati ordered a brain MRI and cervical spine MRI after examining Kenneth. *Id.* at 520. Dr. Kenneth Goldberg interpreted the resulting brain MRI as indicating a "[n]ew small focus of high T2 signal

chronic demyelination[3] in left cerebellar white matter . . . ." *Id.* at 515. Dr. Goldberg also interpreted Kenneth's cervical spine MRI; he opined that the scan showed "mild central stenosis[4] and . . . possible new right-sided disc protrusion requiring clinical correlation for right C7 radicular symptoms." *Id.* at 517. Just a few weeks after the completion of these MRI scans, Dr. Hentati completed his medical source statement, in which he indicated that Kenneth had serious limitations with fatigue and balance. Physical therapist Tamara Sedenkov also observed, after a 2.5 hour evaluation in January of 2017, that Kenneth's "tolerance to functional activities, including walking, standing, stair climbing, lifting, [and] squatting potentially could get effected [sic] by possible muscle fatigue associated with multiple sclerosis diagnosis." *Id.* at 542. In terms of Kenneth's balance issues, Kenneth reported, and doctors acknowledged, Kenneth's limitations in balance. (*See, e.g., id.* at 433, 450, 518, 542). As a result, the ALJ may have been mistaken in suggesting that there was "insufficient evidence" for Dr. Hentati to conclude that Kenneth's limitations prevented him from sustaining fulltime employment.

However, it is possible that the ALJ is correct that Kenneth's limitations could be accommodated by "sedentary limitations with further postural and environmental limitations." Nevertheless, the ALJ failed to explain why the evidence was insufficient to support the severity

---

[3] Demyelination is the "destruction, removal, or loss of the myelin sheath of a nerve or nerves." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 488 (32nd ed. 2012). "When the myelin sheath is damaged, nerve impulses slow or even stop, causing neurological problems." DEMYELINATING DISEASE: WHAT CAN YOU DO ABOUT IT?, http://www.mayoclinic.org/diseases-conditions/multiple-sclerosis/expert-answers/demyelinating-disease/faq-20058521 (last visited October 3, 2019).

[4] "Spinal stenosis is a narrowing of the spaces within your spine, which can put pressure on the nerves that travel through the spine . . . Some people with spinal stenosis may not have symptoms. Others may experience pain, tingling, numbness and muscle weakness. Symptoms can worsen over time." SPINAL STENOSIS, http://www.mayoclinic.org/diseases-conditions/spinal-stenosis/symptoms-causes/syc-20352961(last visited on October 3, 2019).

of Kenneth's balance and fatigue issues. In this way, the ALJ essentially argued that Dr. Hentati's opinion that Kenneth could not sustain a 40-hour per week work schedule was inconsistent with the record without explaining why. *See Frobes v. Barnhart*, 467 F. Supp. 2d 808, 819 (N.D. Ill. 2006) (if an ALJ discounts a treating physician's opinion as inconsistent with the evidence, "she must explain the inconsistency"). The ALJ additionally failed to explain how sedentary limitations could accommodate Kenneth's issues with balance and fatigue, or what the ALJ meant by "further postural and environmental limitations." The ALJ thus failed to build the requisite accurate and logical bridge between the evidence and his decision to discount Dr. Hentati's opinion. *See Lambert v. Berryhill*, 896 F.3d 768, 774 (7th Cir. 2018). The Court therefore cannot "understand the link between the evidence and the ALJ's decision." *Enuenwosu v. Berryhill*, No. 16 C 5719, 2017 WL 2684092, at *6 (N.D. Ill. June 21, 2017) (noting that "[w]ithout such a logical bridge, the Court cannot trace the path of the ALJ's reasoning").

Although not directly raised by Kenneth, the Court further observes that the ALJ failed to articulate what weight, if any, he assigned Dr. Hentati's opinions regarding Kenneth's mental limitations, specifically his issues with memory, concentration, and attention. It is unclear whether the ALJ considered Dr. Hentati's opinion that Kenneth's concentration limitations made him unable to adequately perform a desk job. On the one hand, the jobs that the ALJ determined Kenneth could perform at step five—document repairer, table worker, and touch-up screener—do not appear to be desk jobs. On the other hand, as discussed further below, the ALJ's RFC discussion does not contain analysis on Kenneth's limitations in concentration, persistence, or pace. In any event, the weight given to the treating physician's opinion must be explained, not implied. The "ALJ's decision cannot leave the weight given to the treating physician's testimony to mere inference: the decision must be sufficiently specific to make clear to any subsequent

reviewers the weight the ALJ gave to the treating source's medical opinion and the reasons for that weight." *Ridinger v. Astrue*, 589 F.Supp.2d 995, 1006 (N.D. Ill. 2008) (internal quotation and citation omitted); *see also* SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996) (stating an ALJ's decision "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.").

Here, the ALJ provided no analysis concerning what weight he assigned Dr. Hentati's opinion that Kenneth "has fatigue and difficulty with concentration common in multiple sclerosis that makes him unable to perform a desk job." The Court cannot determine from the ALJ's opinion what specific weight the ALJ gave to Dr. Hentati's opinion in this regard. *Thompkins v. Astrue*, 2010 WL 5071193, at *7 (N.D. Ill. Dec. 6, 2010) (noting that a "treating physician's report can be given controlling weight on some points and non-controlling weight on others."). Because the ALJ did not explain how he weighed Dr. Hentati's opinion regarding Kenneth's mental limitations, the Court cannot discern whether the ALJ considered Dr. Hentati's assessment of Kenneth's memory and concentration issues in evaluating Kenneth's RFC. Accordingly, this case must be remanded so the ALJ can state the specific weight given to Dr. Hentati's opinion and the reasons for it. *See* 20 C.F.R. § 416.927(c) (stating that the Commissioner "will evaluate every medical opinion we receive.").

Because the ALJ failed to properly address each of the checklist factors, because his apparent reasons for discounting Dr. Hentati's opinions are not supported by substantial evidence in the record, and because the ALJ failed to assign weight to Dr. Hentati's opinions on mental limitations, the Court finds that the ALJ's decision is reversed and remanded for having improperly weighed Dr. Hentati's opinions. Upon remand, the ALJ should explain with sufficient specificity, *see* SSR 96-2p, what weight, if any, he gives to Dr. Hentati's opinions regarding Kenneth's

physical and mental limitations.  If the ALJ gives less than controlling weight to any of Dr. Hentati's opinions, he must then apply the regulatory checklist factors in explaining his reasoning.

Kenneth makes the additional argument that "if the ALJ had any doubt regarding the basis for Dr. Hentati's opinion, he should have re-contacted Dr. Hentati for clarification." (Doc. 18 at 9).  The Commissioner responds that there is no such requirement.  To the extent the Commissioner means that there is no categorical rule requiring an ALJ to re-contact the treating physician, the Court agrees.  "Social Security proceedings are inquisitorial rather than adversarial. It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits." *Sims v. Apfel*, 530 U.S. 103, 110–11 (2000).  The regulations set forth options for the ALJ in considering evidence, including the option of recontacting a medical source.  *See* 20 C.F.R. § 404.1520b(b).  However, the ALJ need not re-contact the medical source when the record "contain[s] adequate information for the ALJ to render a decision." *Britt v. Berryhill*, 889 F.3d 422, 427 (7th Cir. 2018).  *See also Skinner v. Astrue*, 478 F.3d 836, 843–44 (7th Cir. 2007).

In light of the Court's holding that the ALJ failed to properly weigh Dr. Hentati's opinions, as discussed above, the Court declines to decide whether the ALJ needed to re-contact Dr. Hentati in this case.  The Court nevertheless notes that it may be helpful for the ALJ to re-contact Dr. Hentati and Dr. Fauzia Rana, as the ALJ characterized both doctors' opinions as "somewhat vague." (R. 26, 27).

## B.    Concentration, Persistence, or Pace

Kenneth argues that despite finding moderate limitations in maintaining concentration, persistence, or pace, the ALJ failed to account for those limitations in the RFC, and in the hypothetical questions to the vocational expert.  According to Kenneth, the RFC's limiting of

Kenneth to "simple tasks" did not adequately address his limitations in concentration, persistence, or pace.

Both "'the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record,' including even moderate limitations in concentration, persistence or pace." *Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019) (quoting *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015)). While the ALJ is not bound to any set of magic words, the ALJ must apprise the vocational expert fully of the claimant's limitations, "so that the VE can exclude those jobs that the claimant would be unable to perform." *Id.* (citing *Moreno v. Berryhill*, 882 F.3d 722, 730 (7th Cir. 2018)). In other words, there is no "per se requirement" that the ALJ use the "specific terminology" of "concentration, persistence, [or] pace." *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010). The Court will accept "an ALJ's hypothetical omitting the terms 'concentration, persistence [or] pace' when it [is] manifest that the ALJ's alternative phrasing specifically exclude[s] those tasks that someone with the claimant's limitations would be unable to perform." *Id.*

Courts in this Circuit have "repeatedly rejected the notion that a hypothetical . . . confining the claimant to simple, routine tasks and limited interactions with others adequately captures temperamental deficiencies and limitations in concentration, persistence, and pace." *Yurt*, 758 F.3d at 858–59. "In most cases employing terms like 'simple, repetitive tasks' on their own will not necessarily exclude from the VE's consideration those positions that present significant problems of concentration, persistence and pace, and thus, alone, are insufficient to present the claimant's limitations in this area." *Winsted v. Berryhill*, 923 F.3d 472, 477 (7th Cir. 2019) (internal quotation marks and citations omitted).

Here, the Court agrees that the RFC fails to accommodate Kenneth's limitations in concentration, persistence, or pace. In step three of his analysis, the ALJ acknowledged that Kenneth has moderate limitations in "concentrating, persisting, or maintaining pace." (R. 21). The RFC states that Kenneth is "able to perform simple tasks with no interaction with the public," *id.* at 22, but the ALJ fails to explain how limiting Kenneth to simple tasks and keeping him from interacting with others is connected to, or accommodates, his problems in concentration, persistence, or pace. Like in *Winsted*, without an explanation bridging the gap between Kenneth's moderate limitations in concentration, persistence, or pace and the RFC's prescription of simple tasks and restricted interaction with the public, the Court cannot find that the RFC accounts for all of Kenneth's limitations. *Winsted*, 923 F.3d at 473; *see Craft v. Astrue*, 539 F.3d 668, 677–78 (7th Cir. 2008) (remanding due to absence of "'accurate and logical bridge' between the ALJ's recitation of the mental medical evidence and the decision to account for [the claimant's] mental impairments by limiting him to unskilled work"); *Justin H. v. Berryhill*, No. 2:18CV383, 2019 WL 2417423, at *8 (N.D. Ind. June 7, 2019) (remanding where ALJ failed to explain how limiting claimant to "understanding, remembering, and carrying out simple, routine, and repetitive tasks but not at a production rate pace" addressed claimant's problems with concentration, persistence, and pace).

The RFC's underlying hypothetical similarly fails to accommodate Kenneth's limitations in concentration, persistence, or pace. One hypothetical appeared directed at concentration, persistence, or pace. In the seventh scenario, the ALJ asked the vocational expert to assume that "the individual would . . . reasonabl[y] likely to be off task for more than 20 percent of the workday." (R. 82). But the ALJ did not rely on that hypothetical, as is evident by the vocational expert's answering testimony. Ms. Gels, the vocational expert, reported that no jobs in the

unskilled workplace would tolerate 20% off-time task and that the allowance for off-task time was "at most 10 to 15 percent." *Id.* at 83. The hypothetical actually relied upon by the ALJ, which limited the individual to "performing simple tasks that would involve no interaction with the general public," *id.* at 79, is deficient for the same reasons as the RFC; limiting Kenneth to simple tasks and restricting his access to the public does not adequately address his issues with concentration, persistence, or pace.

The Commissioner contends that the ALJ's limiting Kenneth to simple tasks without social interaction is not fatal in this case because an ALJ may rely on the narrative opinion provided by medical experts in their mental residual functional capacity assessments. (Dkt. No. 29 at 13). More specifically, the Commissioner argues that under *Capman v. Colvin*, 617 F. App'x 575 (7th Cir. 2015), an ALJ may reasonably rely on the narrative opinion provided by a medical expert in Section III of a mental residual functional capacity assessment, so long as the narrative is not inconsistent with the worksheet notations in Section I. The Commissioner further asserts that the ALJ did so rely on the Section III narratives of Drs. Tin and Jackson in this case.

The Court disagrees. There is no evidence that the ALJ relied upon the Section III narratives of Dr. Tin and Dr. Jackson when limiting Kenneth to simple tasks and restricting his interaction with the public in the RFC. Their names are nowhere to be found in the ALJ's opinion, and the ALJ does not discuss what weight, if any, he gave to their opinions. The closest that the ALJ comes to discussing their assessments is in his treatment of Dr. Hentati: "These opinions of the claimant's treating physician . . . are generally consistent with the evaluations of opinions of State agency medical consultants contained in Exhibits 1A and 7A." (R. 26).

Additionally, the Commissioner reads *Capman* too broadly. In *Capman*, a non-precedential order, the issue before the court was the purported inconsistency between Section I

of Dr. Kenneth Lovko's mental residual functional capacity assessment and Section III of that form. 617 F. App'x at 578–79. Capman argued that the ALJ's RFC findings—which restricted Capman to simple, routine tasks and limited interaction with others—did not adequately reflect his limitations in concentration, persistence, and pace, which Dr. Lovko "classified as 'moderate' in a checklist in Section I of the RFC Assessment." *Id.* at 578. The Commissioner argued that the ALJ may reasonably rely on the Section III narrative, which is the psychologist's "bottom-line assessment." *Id.* The Section III narrative from Dr. Lovko "explained that Capman's symptoms could 'present some impediment to work situations with large numbers of people,' but that 'it does seem that [Capman] could deal with environments that have fewer persons in them, and where stress is limited.'" *Id.* at 577. In Dr. Lovko's opinion, Capman could "carry out unskilled tasks, relate to others on a superficial basis, 'attend to task[s] for sufficient periods of time,' and manage the stress of unskilled work." *Id.* The *Capman* court held that Dr. Lovko's notations in Sections I and III of his assessment were not inconsistent, and that "the limitations incorporated into the ALJ's RFC findings adequately addressed Capman's deficiencies in concentration, persistence, and pace" because the "medical evidence and Capman's testimony support the finding that any limitations in concentration, persistence, and pace stem from Capman's anxiety attacks." *Id.* at 579.

*Capman* thus did not create a blanket rule that an ALJ need not accommodate the moderate limitations in concentration, persistence, or pace simply because a Section III narrative adequately translates the limitations into a mental RFC that the ALJ could reasonably adopt. The Seventh Circuit expressly recognized that there is no such blanket rule in its precedential opinion, *Varga v. Colvin*, 794 F.3d 809 (7th Cir. 2015), which was decided a few weeks after *Capman*. *See Varga* at 816.

Furthermore, *Capman* is distinguishable from this case in that the Section III narrative adequately translated the Section I findings on concentration, persistence, or pace. Here, Dr. Tin and Dr. Jackson's Section III narratives (which are identical to one another) fail to adequately translate their Section I findings. More specifically, in Section I, Drs. Tin and Jackson acknowledge various limitations in Kenneth's ability to: carry out "very short and simple instructions"; carry out detailed instructions; to maintain attention and concentration for extended periods; to work in coordination with or in proximity to others; and to make simple-work related decisions. (R. 146-147, 113-114). Yet their Section III narratives simply conclude "Claimant has difficulty carrying out detailed instructions and maintaining attention and concentration for extended periods of time, however the person is capable of performing simple tasks." *Id.* at 114, 148. Additionally, the ALJ's reliance on the mental residual functional capacity assessments of Drs. Tin and Jackson in this case likely would have been an error, as their assessments were based purely on an outdated review of records. That is, their assessments were conducted in 2014 and 2015, without the benefit of the subsequent medical evaluations and opinions of Dr. Hentati and physical therapist Sedenkov. *See, e.g., Hoyt v. Colvin*, 553 F. App'x 625, 627–28 (7th Cir. 2014) (holding that the ALJ erred by relying solely on the opinions of state-agency physicians who never examined the claimant and whose "dated opinions could not account for how [the claimant's] condition might have deteriorated"); *see also Akin v. Berryhill*, 887 F.3d 314, 317 (7th Cir. 2018) (holding ALJ erred in crediting state-agency opinions, which were outdated and missing approximately 70 pages of medical records). Simply put, the Commissioner's reliance on *Capman* misses the mark.

In his reply brief, Kenneth makes the more-narrow argument that reversal is necessary because the RFC does not reflect the off-time task testimony obtained by the vocational expert in

connection with the seventh hypothetical. The Commissioner argues that Kenneth's argument is waived as an argument made for the first time on reply. For the reasons discussed above, the Court does not need to address Kenneth's off-task argument to find that the ALJ committed reversible error when he failed to accommodate Kenneth's moderate limitations in concentration, persistence, or pace.

## B.    Harmless Error

The ALJ's treating physician and concentration, persistence, or pace errors were not harmless in this case. An error is harmless when it is "predictable with great confidence that the agency will reinstate its decision on remand because the decision is overwhelmingly supported by the record though the agency's original opinion failed to marshal that support." *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010); *see McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011) ("Thus, we look at the evidence in the record to see if we can predict with great confidence what the result on remand will be."). Here, because the Court cannot "say with great confidence" what the result on remand would be, the Court cannot find that the ALJ's errors were harmless.

Beginning with the ALJ's error in weighing Dr. Hentati's opinions, that error was harmful for at least two reasons. First, the ALJ's failure to address the regulatory factors in weighing Dr. Hentati as a treating physician was harmful because many of those factors—such as Dr. Hentati's specialization as a neurologist and the frequency, duration, and nature of his treating relationship with Kenneth—support Dr. Hentati's opinions. *See Cauley v. Berryhill*, 312 F. Supp. 3d 746, 761 (N.D. Ind. 2018) (holding treating physician error of failing to articulate the regulatory checklist factors harmful where several of the factors buttressed treating physician's opinions). From the time of Kenneth's MS diagnosis in 2011, Dr. Hentati was Kenneth's treating neurologist. Each time he saw Kenneth, Dr. Hentati's notes indicate that he performed several examinations,

including cranial nerve, motor, sensory, and gait exams. It is therefore possible that, had the ALJ properly analyzed each of the checklist factors, he would have given controlling weight to Dr. Hentati's opinion that Kenneth could not sustain fulltime employment. Second, the ALJ's failure to assign weight to Dr. Hentati's opinions on Kenneth's mental limitations could have impacted the ALJ's handling of Kenneth's issues with concentration, persistence, or pace. Had the ALJ assessed Dr. Hentati's opinions regarding Kenneth's issues with memory and concentration, it is possible that the RFC would have appropriately reflected Kenneth's moderate limitations in concentration, persistence, or pace. The Court therefore cannot "say with great confidence" what the result would be on remand if the ALJ had properly weighed Dr. Hentati's opinions.

As for the ALJ's error in accommodating Kenneth's moderate limitations in concentration, persistence, or pace, the harm from that error can be seen in the testimony of the vocational expert. In the ALJ's seventh hypothetical to the vocational expert, he described an individual who would be off task for more than 20 percent of the workday, meaning "a complete inability to perform work-related activities . . . in a competitive work environment during that time period." (R. 82). The vocational expert responded that no jobs were available for an individual who would be off task for more than 20 percent of the workday. She testified that, "at most," the tolerance for off-task time in the unskilled workplace was 10 to 15 percent. *Id.* at 83. Kenneth's limitations in concentration, persistence, or pace could have contributed to some off-task time. Dr. Hentati, Dr. Tin, Dr. Jackson, and Dr. Yomtoob acknowledged limitations in Kenneth's ability to concentrate. *Id.* at 113, 146, 443, 537-539. As discussed above, the record also indicates that Kenneth struggled with fatigue issues. According to Dr. Hentati, issues with fatigue and concentration are common for patients with MS. *Id.* at 539. If the ALJ had properly accommodated Kenneth's limitations in concentration, persistence, or pace, it is possible that the RFC and hypothetical question relied

upon would reflect more than 15% of off-task time. In that case, the ALJ would have found Kenneth disabled at step five of the analysis. Consequently, the ALJ's concentration, persistence, or pace error is not harmless.

### III.    CONCLUSION

For the foregoing reasons, the Commissioner's Motion for Summary Judgment [28] is denied. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed and this case is remanded to the Social Security Administration for further proceedings consistent with this opinion. The Clerk is directed to enter judgment in favor of Plaintiff and against Defendant Commissioner of Social Security.

**SO ORDERED.**

Dated:  October 8, 2019

Sunil R. Harjani
United States Magistrate Judge